IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LAURA RAINE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-231-RP |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On April 19 and 20, 2021, the Court held a bench trial in this matter. (Dkts. 63, 64). The

parties submitted post-trial briefs. (Pl.'s Am. Br., Dkt. 68-2; Def.'s Am. Br., Dkt. 69). Having

considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and

the governing law, the Court enters the following findings of fact and conclusions of law.

## I. BACKGROUND

On March 25, 2016, William Alleyne ("Alleyne") struck Laura Raine's ("Raine") car, colliding

with the driver's side rear quarter panel of her car. (Orig. Pet., Dkt. 1-1, at 7; Pl.'s Pretrial

Disclosures, Dkt. 49, at 4). At the time, Alleyne was a FEMA employee operating in the course and

scope of his employment with the United States (the "Government"). (*Id.* at 8). The parties

stipulated that when the cars collided, Alleyne was traveling northbound on the Interstate-35

Frontage Road, and Raine was traveling westbound on the US 290 Frontage Road. (Pl.'s Pretrial

Disclosures, Dkt. 49, at 4). Both cars were damaged, but not significantly damaged, and neither

Raine nor Alleyne sought emergency medical attention after the accident. (Tr. Day 1, 91–95). As will

be discussed in detail below, Raine did sustain injuries in the crash, although the parties dispute

which injuries were caused by the crash and the extent of those injuries. (Pl.'s Pretrial Disclosures,

Dkt. 49, at 4).

On February 11, 2019, Raine sued the Government in state court for her injuries. (Orig. Pet., Dkt. 1-1).  The Government removed the case to this Court in March 2019. (Dkt. 1). On October 15, 2020, Raine filed a motion for partial summary judgment on liability, (Dkt. 38), which the Court granted, (Dkt. 55). Having found that that Alleyne caused the accident, the Court accepted evidence at the bench trial on the remaining issues of causation and damages.

## II. SUMMARY OF THE EVIDENCE

During Raine's case, the Court heard testimony from Raine, her friend Karen Reynolds ("Reynolds"), and her treating physicians Dr. Robert Josey ("Dr. Josey"), Dr. Benjamin Amis ("Dr. Amis"), and Dr. Daniel Frederick ("Dr. Frederick"). During the Government's case, the Court heard testimony from its expert Dr. Benzel MacMaster ("Dr. MacMaster").

### A.  Raine's Prior Car Accident and Medical History

In 2013, Raine was involved in another car accident when she was rear-ended in a chain collision. (Tr. Day 1, at 26). That accident caused injuries to her knees and neck. (*Id.*). In April 2015, Raine had neck surgery, specifically a cervical surgery to fuse two vertebrae in her neck known as an Anterior Cervical Discectomy and Fusion ("ACDF"), often referred to as a spinal or cervical fusion surgery by the testifying physicians. (*Id.* at 27, 186–87). The surgery fused her C5-C6 and C6-C7 discs. (*Id.* at 27). Her surgery was performed by Dr. Josey, (*id.*), who is an orthopedic spine specialist. Raine and her physicians testified that she completed her post-operative care and recovered well. (*Id.* at 29–31, 145; Tr. Day 2, at 7, 21–22). Before that surgery, she also had an asymptomatic small disc hernia of her C3-C4 disc and asymptomatic minor central disc bule of her C7-T1 disc. (D-12; Tr. Day 1, at 146; Tr. Day 2, at 53).

### B.  Changes to Raine's Neck After the Accident

After the subject car accident, Raine began to suffer neck pain again—that also radiated into her arms—and saw Dr. Josey three days later. (Tr. Day 1, at 47–48; P-6). An x-ray taken that day did

not show an injury. (D-6; Tr. Day 2, at 101). She returned to Dr. Josey in July 2016, complaining of pain in her neck and both arms, and an x-ray and exam revealed no changes. (D-6; Tr. Day 2, at 57–59). Dr. Josey ordered an MRI of her cervical spine (neck), which was done in August 2016. (Tr. Day 2, at 26–27). The MRI results showed changes at C3-C4 and C7-T1, with those discs in worse condition than before. (Tr. Day 2, at 24–25, 27–30, 70). Since Raine still experienced a pain level of 8 out of 10, Dr. Josey referred Raine for pain management care with Dr. Frederick, (D-7; Tr. Day 2, at 30–31), who is a pain management specialist. Raine also pursued chiropractic care and physical therapy from December 2016 to June 2017. (Tr. Day 1, at 68–71; Tr. Day 2, 178–79; P-15).

Dr. Frederick provided pain management care consisting of injections and "nerve burns" to the C3-C4 levels of her cervical spine. (Tr. Day 1, at 112–40, 187–89, 191, 193). Those procedures, plus the chiropractic care and physical therapy, helped greatly improve Raine's symptoms but did not resolve her neck pain, leaving her still with a 3 out of 10 pain level. (Tr. Day 1, at 139–40).

While Raine was generally doing better than before, she continued to follow up with Dr. Josey and had repeat MRIs in 2018 and 2020. (P-6). The 2018 MRI showed the same problems as the 2016 MRI, with more disc protrusion at C7-T1. (Tr. Day 2, at 33–34). The 2020 MRI showed significant worsening, with a large protrusion at C7-T1. (*Id.* at 36). Dr. Josey once again referred Raine to Dr. Frederick for pain management care. Dr. Frederick performed injections, which would help initially and then the pain would worse again. (Tr. Day 1, at 80–81, 141–49).

## C.    Opinions About the 2016 Accident Causing Raine's Neck Pain

The physicians who testified at trial disagreed about what caused the changes to Raine's neck. Dr. Josey opined, to a degree of reasonable medical certainty, that the 2016 accident caused Raine's ongoing neck pain. (Tr. Day 2, at 30, 73–74). He testified that all her medical care since the accident was necessary to treat her injuries sustained in the collision. (*Id.* at 41–42). He further opined that she will require surgery to treat her C7-T1 herniated disc since more conservative care

was unsuccessful. (Tr. Day 2, at 20, 22, 39). Dr. Frederick similarly testified that the medical care he provided to Raine was necessary to treat her injuries sustained in the collision. (Tr. Day 1, at 150–54).

Dr. MacMaster, who was the Government's retained expert and an orthopedic surgeon, (Tr. Day 2, at 78), testified that the C4-C5 herniation could not reasonably be found to have been caused by the accident since it did not appear in the first MRI taken several months after the accident. (Tr. Day 2, at 107). Likewise, he testified that the small bulge at C3-C4 was not reasonably related to the accident. (*Id.* at 120). He finally testified that the large protrusion at C7-T1 could not be reasonably related to the accident since it also did not appear in the MRI taken several months after the accident. (*Id.* at 119–20). Rather, he testified that the damage was consistent with Adjacent Segment Degeneration, a condition seen in patients who have had a previous fusion surgery, as it was in the first vertebral space below the C5-C7 fusion and it had been five years since Raine underwent ACDF. (*Id.* at 97–99, 172).

### D. Raine's Carpal Tunnel Injury and Care

In addition to neck pain, Raine experienced the symptoms of carpal tunnel syndrome. She saw Dr. Amis, an orthopedic hand specialist who treated Raine for carpal tunnel syndrome in both hands. (Tr. Day 1, at 231–34). After diagnosing Raine using nerve conduction testing, Dr. Amis performed carpal tunnel release surgery on both of her hands, (*id.* at 251–52, 256, 260), with good results, (*id.* at 258). Dr. Amis opined, to a degree of reasonable medical certainty, that Raine's carpal tunnel syndrome was caused by the 2016 accident because she held the steering wheel. (*Id.* at 37–38, 260, 272–73). To the contrary, Dr. MacMaster opined that Raine's carpal tunnel syndrome could not be reasonably connected to the accident because she did not fracture her wrists and that other risk factors were the likely cause. (Tr. Day 2, at 122–124).

### E.      Raine's Testimony

Raine testified about her injuries and symptoms caused by the accident, the medical care she received, and the impact the accident and injuries have had on her life. She testified that she began to have neck pain again after the accident and sought care again from Dr. Josey. (Tr. Day 1, at 47–48; P-6). She testified that the injections given by Dr. Frederick provided pain relief but did not resolve her pain and the improvement was not permanent. (*Id.* at 80–81, 141–49). Raine testified that pain interfered with her sleep, (*id.* at 57–58), and caused mental distress, (*id.* at 65–66).

### F.      Karen Reynolds's Testimony

The Court heard testimony from Karen Reynolds ("Reynolds"), Raine's friend and former roommate. Reynolds testified that she and Raine were roommates before the accident and that Raine changed after the accident. "Her demeanor changed, as well. She went from this happy-go-lucky type person to being much more somber and you could tell by looking at her that she was hurting." (Tr. Day 2, at 7). Reynolds also confirmed that the pain caused Raine sleepless nights. (*Id.* at 8).

### III. DISCUSSION

### A. Whether the Accident Caused Raine's Injuries

In negligence suits brought under the Federal Tort Claims Act, like this one, the Court applies the substantive law of the state in which the alleged negligence took place. 28 U.S.C. §§ 2671 et seq.; *Hayes v. United States*, 899 F.2d 438, 443 (5th Cir. 1990). Under Texas law, to prove negligence, the plaintiff must establish that the Government's breach of duty proximately caused the Plaintiff's injury. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Kroger Co. v. Milanes*, 474 S.W.3d 321, 338 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Proximate cause is usually a question of fact unless the evidence is undisputed and only one reasonable inference can be drawn. *Ambrosio v. Carter's Shooting Ctr.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). A plaintiff's burden under Texas law to prove that a car accident caused her injuries is

based on a reasonable degree of medical certainty. *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999).

The outcome of this case turns on the competing testimony between Dr. Josey and Dr. MacMaster as to whether, and the extent to which, the accident caused Raine's neck pain and injuries.[1] The Court finds that Dr. Josey's testimony on Raine's neck pain and injuries was more credible and probative on the issue of causation. First, Dr. Josey's opinion was careful. He considered the possible causes for the significant C7-T1 herniation and opined that it was caused by the collision. (Tr. Day 2, at 38, 51, 66–68). Second, his opinion remained firm, despite significant cross examination:

> Q. And it's your testimony that you can state to a reasonable degree of medical certainty that blowing her disc out two to four years after the car accident is because of the car accident?
>
> A. I think she sustained an injury to that disc in that car accident in 2016 that made it more likely than not that the disc herniation is the result of that injury that she sustained in 2016. And without that injury, I don't think she would have reherniated that disc. And I think -- yes, I think that is more likely than not the reason that she herniated the disc.

(*Id.* at 66–67). Third, Dr. Josey was Raine's treating physician for years. Combining his personal knowledge of Raine's medical history with his expertise in the field, the Court found his testimony informative and reliable. Fourth, Dr. Josey reviewed the reports and the actual images from the MRIs, adding credence to his opinions. (Tr. Day 2, at 29). Finally, other evidence in the case—testimony and documents—do not contradict or conflict with Dr. Josey's causation opinion.

In contrast, while the Court found Dr. MacMaster knowledgeable, the Court did not find his theories or opinions regarding Raine's neck pain and injuries persuasive or supported by the record. Dr. MacMaster largely based his opinion on his theory that because the herniation at C7-T1 was not

---

[1] Necessarily linked to the physician testimony was Raine's testimony. The Court found Raine to be a credible witness and accepts her testimony.

present on the MRI from 2016, the herniation could not have been caused by the accident. He instead attributed that significant herniation to Adjacent Segment Degeneration. (Tr. Day 2, at 97–99, 172). Dr. Josey testified that Adjacent Segment Degeneration becomes a risk 10-15 years after a fusion surgery like Raine had. (Tr. Day 2, at 51). Raine's significant herniation developed after only five years. Indeed, Dr. MacMaster agreed with Dr. Josey's testimony regarding when Adjacent Segment Degeneration develops, saying, "I think Dr. Josey's statistical analysis would be accurate." (Tr. Day 2, at 97). Finally, Dr. MacMaster, on cross examination, admitted that he could not point to Adjacent Segment Degeneration as the cause of Raine's injury:

> Q. [Y]ou're not going to say in reasonable medical certainty that this C7-T1 herniation was caused by adjacent segment disease, right?
>
> A. That's right.

(Tr. Day 2, at 177). Considering the testimony and evidence presented in this case, the Court concludes that Raine met her burden of showing that the collision proximately caused her neck injuries.

The Court also finds that Dr. Frederick's medical care was necessary and reasonable. Indeed, the Government's only real dispute with Dr. Frederick's care was Dr. MacMaster's opinion that the injections to her C4 nerve were unnecessary because "the C4 nerve could not be the cause of Raine's symptoms and because a third round of [injections] was unreasonable in light of the poor response of her pain to the treatments." (Tr. Day 2, at 113–14). While the initial treatment may not have been a complete success, Dr. Frederick's care improved Raine's symptoms. In fact, Dr. MacMaster conceded that other care provided by Dr. Frederick was "successful in treating Raine's pain," as it lowered Raine's pain level to 3 out of 10. (Tr. Day 1, at 199–200; D-7).

On the other hand, the Court rejects Raine's claim that the accident caused her carpal tunnel syndrome. The evidence supports that Raine suffered from pain and numbness in her hands, that Dr. Amis correctly diagnosed her symptoms as carpal tunnel syndrome, and that Dr. Amis's carpal

tunnel release surgery provided Raine relief from her symptoms of carpal tunnel syndrome. However, the Court's inquiry is focused on causation, and the evidence does not support Raine's theory that the accident caused her carpal tunnel syndrome. Risk factors such as a person's sex (being a woman), age (being older), weight (a higher BMI), and occupational background (a job that requires repetitive motion) increase the likelihood that a person will develop carpal tunnel syndrome. (Tr. Day 1, at 121; Tr. Day 2, at 269–70). Raine's sex, age, and weight all put her at increased risk of developing carpal tunnnel syndrome. (Tr. Day 1, at 121). Moreover, car accidents rarely lead to carpal tunnel syndrome. (Tr. Day 2, at 140–41). When an accident does lead to carpal tunnel syndrome, typically there is a fracture or significant sprain of the wrist that causes swelling. (*Id.*). After the accident here, Raine did not complain of any wrist injury. (P-6, Tr. Day 2, at 124). That said, Dr. MacMaster's opinion—that Raine's carpal tunnel syndrome could not reasonably be connected to the accident because she did not fracture her wrists—goes too far. (*See* Tr. Day 2, at 122–24). Dr. Amis's opinion—that 5-10% of patients with severe sprain, but not fracture, develop carpal tunnel syndrome—was more credible. (Tr. Day 1, at 271). In fact, Dr. MacMaster conceded that carpal tunnel syndrome can be caused by trauma absent fracture. (Tr. Day 2, at 122–23). In the end, the Court finds that because Raine had no wrist complaints or injuries after the accident and because even if there was an unknown severe sprain it would cause carpal tunnel syndrome in only 5-10% of people, the car accident did not proximately cause Raine's carpal tunnel syndrome.

In sum, the Court finds that the accident proximately caused the injuries described by Raine's treating physicians, including injuries to Raine's C3-C4 and C7-T1 spinal discs and the C7-T1 disc herniation but excluding carpal tunnel syndrome.

### B. Damages

Having found that the accident caused Raine's neck injury, the Court turns to damages.

### 1. Past Medical Expenses

To recover for past medical expenses, a plaintiff must prove that the expenses were necessary to treat the injury, were reasonable in amount, and the expenses were paid or incurred by or on behalf of the plaintiff. *See* Tex. Civ. Prac. & Rem. Code. § 41.0105 (2008).

The Court finds that the accident proximately caused damages arising from the injuries sustained by Raine. Starting with past medical expenses, the Court credits the testimony of Dr. Josey and Dr. Frederick regarding the reasonableness and necessity of their past medical care. Dr. Josey testified that the reasonable charges for his past care were $10,210.86 and that the care was necessary. (Tr. Day 2, at 41–42; P-5). Dr. Frederick testified that the reasonable charges for his past care were $37,525.50 and that the care was necessary. (Tr. Day 1, at 150–55; P-8; P-9). Dr. Frederick also testified that the reasonable and necessary charges for Raine's care with Austin Preferred Integrative Medicine, where he served as the medical director from 2015–19, were $24,553.80.[2] (Tr. Day 1, at 166; P-15). As the former medical director, Dr. Frederick was familiar with the charges for care provided there after reviewing the relevant records. (*Id.* at 166–68; P-15). Dr. Frederick additionally testified that it was reasonable and necessary for Raine to undergo spinal ultrasound testing for diagnostic purposes with respect to her neck pain. (*Id.* at 161–63). Regarding MRIs, Dr. Frederick testified that Raine's MRIs were reasonable and necessary. (*Id.* at 159–61). Since Raine did not offer testimony regarding reasonable charges, the Court relies on Dr. MacMaster's testimony that a reasonable charge for those MRIs were $6,436.

In sum, the Court finds that an award of $78,726.16 would fairly compensate Raine for her reasonable and necessary past medical expenses incurred as a result of the accident.

---

[2] The Court overrules the Government's objection that Raine's expert disclosure for Dr. Frederick did not indicate he would offer opinions about care provided by other health care providers. In the disclosure, Raine states that Dr. Frederick "will describe all medical treatment he provided to Plaintiff, as well as care provided by certain other health care providers, based on a review of medical records." (Plaintiff's Supplemental Disclosures and Designation of Testifying Expert Witnesses, Dkt. 68-1, at 5).

**2. Future Medical Expenses**

To recover for future medical expenses, Raine must show there is a reasonable probability that expenses resulting from the injuries she sustained in the March 26, 2016, collision will be necessary in the future. *See Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 121 (Tex. App.—Texarkana 2006, pet. denied). To make this showing, Raine must provide evidence of: (1) a reasonable probability that she will incur future medical expenses, and (2) the reasonably probable amount of the future medical expenses. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The factfinder may decide the amount of future medical expenses based on: (1) the injuries suffered; (2) the medical care rendered before trial; (3) the injured party's progress toward recovery under the treatment received; and (4) the condition of the injured party at trial. *Id.*

Having considered the testimony of Dr. Josey and Dr. Frederick regarding future medical expenses, the Court concludes based on supporting evidence that in reasonable probability Raine will incur future medical expenses necessary to treat her injuries caused by the accident, namely a future spinal fusion surgery and additional pain management care, and that the reasonably probable total amount of this necessary medical care that Raine will incur in the future is $137,457.40. Raine testified that she understood that having another surgery was inevitable and hoped to have the surgery to be free of her current pain. (Tr. Day 1, at 81). The Court finds that in reasonable probability Raine will require a future spinal fusion surgery, in accordance with the testimony of Dr. Josey, with the reasonable and necessary expense of the surgery and related care being $95,907.40. (Tr. Day 2, at 22, 35–40). Dr. MacMaster agreed that the surgery is medically reasonable and that he "was not complaining" about Dr. Josey's total cost estimate for the surgery. (*Id.* at 130, 168–70). Likewise, the Court finds that in reasonable probability Raine will require future pain management

care, in accordance with the testimony of Dr. Frederick, with the reasonable and necessary expense of that care being $31,550. (Tr. Day 1, at 164–66).

### 3. Pain and Suffering and Mental Anguish

"The term 'mental anguish' implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Pain and suffering damages may be awarded for physical pain (as opposed to mental pain) actually experienced by the a plaintiff in the past, or physical pain the plaintiff will in reasonable probability experience in the future. *See, e.g.*, *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 517 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

Raine has experienced pain since the accident, as described in her testimony, the testimony of her friend Karen Reynolds, and the testimony of her treating physicians, and as evinced by the extensive medical care she has needed in an attempt to alleviate her symptoms. She has suffered chronic and ongoing neck pain. She testified that the pain interfered with her sleep, limiting her to sleeping only 2-3 hours at a time. (Tr. Day 1, at 57–58). She also testified that the pain has caused her mental distress. For example, she testified: "It's almost like you don't have a remedy and it just keeps progressing. Progresses to the point where you think, you know, am I going crazy? Am I mad? I don't understand how this is happening to me. And it makes you not look presentable." (*Id.* at 65). "And then, sometimes you're in so much pain that you just want to scream. I can't even -- it's crazy." (*Id.* at 66).

Reynolds's testimony confirmed the extent of Raine's pain and suffering and her mental distress about the ongoing negative impact of this collision on her life. Reynolds described how Raine changed after the accident: "Her demeanor changed, as well. She went from this happy-go-

lucky type person to being much more somber and you could tell by looking at her that she was hurting." (Tr. Day 2, at 7). Reynolds testified that Raine's inability to fish since the accident makes Raine feel "on the despondent side." (*Id.* at 8). According to Reynolds, Raine no longer can enjoy watching football, which previously was a favorite activity, because of the pain. (*Id.* at 9). Reynolds personally observed Raine's sleepless nights because of the pain. (*Id.* at 8–10). Reynolds testified that Raine "doesn't strike me [as] happy anymore. I mean, she has her happy moments. Don't get me wrong. But overall, she's just a lot more serious. She's a lot less engaging, and any activity or conversation, she's more despondent." (*Id.* at 10).

In the future, Raine will need another spine fusion surgery to treat her herniated C7-T1 disc, which will entail a significant recovery time. Dr. Josey testified that the full recovery period for the surgery he will perform is six months, with activity restrictions for three months and then physical therapy treatment. (Tr. Day 2, at 39). Raine testified that after her last cervical fusion surgery, she was unable to lie down for 10 months. (Tr. Day 1, at 101–102).

Based on the evidence presented, the Court finds that an award of $36,250 would fairly compensate Raine for her past pain and suffering damages and an award of $43,500 would fairly compensate her for future pain and suffering damages.

Based on the evidence presented, the Court finds that an award of $21,750 would fairly compensate Raine for her past mental anguish damages and an award of $14,500 would fairly compensate future mental anguish damages.

### 4. Physical impairment

Physical impairment encompasses the loss of the injured party's former lifestyle. *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.). Raine's testimony demonstrates that since the accident, she is physically impaired because she has lost her former lifestyle. However, much of her testimony, and Reynolds's testimony, focused on the significant problems she has with

her hands. Since the Court found that Raine did not meet her causation burden with respect to her

carpal tunnel syndrome, the Court will not award damages for physical impairment related to Raine's

hands. Raine did testify about how sleep deprivation has impaired her:

> So I would try to lay down. I could never get a good position, okay? That happens to
> a lot of people. I wind up sitting up in recliners, you know, trying to fall asleep that
> way. With this type of internal injury, it almost doesn't even seem that it matters
> what position you're in, it still hurts. It still throbs or gives you pain or you can't feel.
> And I got to the point where when I went to get -- to see Dr. Amis, the hand
> surgeon, I looked crazy. I was getting two to three hours maybe in a 24-hour period
> of sleep and not necessarily at night. And you can't operate that way, even if you're
> just at home.

(Tr. Day 1, at 64).

As discussed above, Raine's future surgery will also involve an impairment period during her

recovery. Dr. Josey testified that the full recovery period for the surgery he will perform is six

months, with activity restrictions for three months and then physical therapy treatment. (Tr. Day 2,

at 39). Raine testified that after her last cervical fusion surgery, she was unable to lie down for 10

months. (Tr. Day 1, at 101–102).

Based on the evidence presented, the Court finds that an award of $45,500 would fairly

compensate Raine for her past physical impairment damages and an award of $50,750 would fairly

compensate her for her future physical impairment damages.

### 5. Physical Disfigurement

"Disfigurement has been defined as that which impairs or injures the beauty, symmetry, or

appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms

in some manner." *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960). Raine's testimony about her

physical disfigurement was limited to the scars on her palms from the carpal tunnel release surgery.

Since the Court found that Raine did not meet her causation burden with respect to her carpal

tunnel syndrome, the Court will not award damages for physical disfigurement related to Raine's

hands.

13

## IV. CONCLUSION

Based on the findings of fact and conclusions of law, the Court finds that the accident at issue proximately caused injuries to Raine, resulting in both economic and non-economic damages. Accordingly, the Court **AWARDS** the following damages to Raine:

| | |
|---|---|
| Past medical expenses | $78,726.16 |
| Future medical expenses | $137,457.40 |
| Past pain and suffering | $36,250 |
| Future pain and suffering | $43,500 |
| Past mental anguish | $21,750 |
| Future mental anguish | $14,500 |
| Past impairment | $43,500 |
| Future impairment | $50,750 |
| **Total** | **$426,433.56** |

**IT IS FURTHER ORDERED** that post-judgment interest shall accrue beginning with the day the judgment is filed with the Comptroller General. *See* 28 U.S.C. § 1961, 31 U.S.C. § 1304(b)(1)(A); *Transco Leasing Corp. v. United States*, 992 F.2d 552, 557 (5th Cir. 1993). The post-judgment interest rate as of March 25, 2022 is 1.55% per annum. *See* https://www.txwd.uscourts.gov/for-attorneys/post-judgment-interest-rates-weekly/.

A final judgment will be entered separately.

**SIGNED** on March 31, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE